422 S.E.2d 494

**Dallas Stevenson DOBSON, Plaintiff Below, Appellee,**

v.

**EASTERN ASSOCIATED COAL CORPORATION, a Corporation, West Virginia Division, Defendant Below, Appellant.**

No. 20482.

Supreme Court of Appeals of West Virginia.

Submitted March 10, 1992.

Decided July 23, 1992.

Dissenting Opinion Feb. 10, 1993.

---

C. David Morrison, Steptoe & Johnson, Clarksburg, for appellant.

Frank M. Ellison, Madison, for Appellee.

Mario J. Palumbo, Kathleen Manshiem, Mary Catherine Buchmelter, Office of Atty. Gen., Charleston, for amicus curiae, W.Va. Human Rights Com'n.

Robert Bastress, Allan N. Karlin, Emily Spieler, Morgantown, for amici curiae, W.Va. Chapter of Nat. Organization for Women, W.Va. Civil Liberties Union and W.Va. Branch of Nat. Ass'n for Advancement of Colored People.

McHUGH, Chief Justice.

This case is before the Court upon the appeal of Eastern Associated Coal Corporation, the defendant below, from the May 17, 1991 order of the Circuit Court of Boone County. The appellee and plaintiff below is Dallas S. Dobson. The appellant is aggrieved by the circuit court's denial of the appellant's motion to set aside the jury verdict rendered in favor of the appellee in the amount of $325,000, and attorney's fees and costs in the amount of $94,887.05.

I

The appellee was employed by the appellant as a "face supervisor," which is a front-line production foreman who supervises a crew of miners belonging to a union. He was employed by the appellant for fifteen years, holding a number of positions during that period. The appellee had been a coal miner for a total of approximately 25 years.

During the 1970's and 1980's, while the appellant had reduced its work force, the appellee had maintained his employment with the appellant. However, in December, 1987, the appellant was forced to reduce its work force again. With respect to this reduction in work force, union employees were covered by the effective collective bargaining agreement, but supervisory employees, such as the appellee, were not.[1] Consequently, the appellant resorted to a plan to conduct the reduction. John Hull, a vice-president of the appellant, met with two lawyers from the company's legal staff, representatives from the company's personnel department, and outside counsel. This meeting took place on December 10, 1987.

The appellant operated six mines in Boone County, and the reduction-in-work-force plan it chose to implement was to evaluate the foremen at *each* of its six mines. Because the reduction in union personnel at two of the mines would result in a 12 percent reduction in supervisory personnel, the decision was made to lay off the lowest evaluated 12 percent of foremen at

---

1. Two hundred sixty-four union miners were laid off as part of this reduction in force. Those selected for layoff were in accordance with the collective bargaining agreement.

*each* mine. Outside counsel approved the plan and testified that it was age-neutral.

With respect to the evaluation system itself, the evaluations had already been conducted in May, 1987, one month after the appellant was acquired by Peabody Holding Co., Inc. The appellee's immediate supervisor, Mark Stanley, conducted this evaluation, which consisted of assigning a numerical value from 1 to 9, to fourteen different factors, such as quality of work, safety consciousness, and job knowledge. These scores were then averaged.

The appellee received a score of 5.58.[2] Accordingly, the appellee, who was 48 years old, was laid off on January 15, 1988, along with 22 other employees.

In March, 1988, two positions of employment became available at the appellant's mine where the appellee had been employed. The appellee and six others were notified of the openings, but following the interview, it was determined that the appellee lacked the experience in "longwall moving" which the appellant claims to have been necessary for those two positions.

A face supervisor position became available in October, 1989, and the appellee was extended an unconditional offer of reemployment, but rejected this offer because his psychiatrist was of the opinion that he was too ill to return to work.[3]

The appellee filed suit against the appellant based upon age discrimination for the January 15, 1988 layoff and the failure to rehire him. Following trial, which lasted from August 15, 1990 to September 12, 1990, the jury returned a verdict in favor of the appellee in the amount of $325,000, of which $200,000 represents economic losses and $125,000 represents emotional distress damages. The appellee was also awarded attorney's fees in the amount of $94,887.05.

This appeal ensued from the trial court's failure to direct a verdict in favor of the appellant, and the denial of the appellant's motion to set aside the verdict or enter judgment notwithstanding the verdict in its favor.

## II

Primarily, the appellant contends that the appellee failed to make a prima facie case of age discrimination. Under *W.Va. Code*, 5–11–9(a)(1) [1992], it is "an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, ... [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required[.]" "The term 'discriminate' or 'discrimination' means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, *age*, blindness, handicap or familial status and includes to separate or segregate[.]" *W.Va. Code*, 5–11–3(h) [1992] (emphasis supplied).

In syllabus point 3 to *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986), this Court held:

In order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W.Va. Code § 5–11–1 *et seq.* (1979), the plaintiff must offer proof of the following:

(1) That the plaintiff is a member of a protected class.

(2) That the employer made an adverse decision concerning the plaintiff.

(3) But for the plaintiff's protected status, the adverse decision would not have been made.

In *Conaway*, we held that a plaintiff need not show *direct proof* of discrimination, but may offer alternative evidence.

The first two parts of the test are easy, but the third [regarding whether

---

**2.** As a cross-check of its evaluation system, the evaluations also consisted of ranking the supervisory employees on a "best-to-worst" basis. The appellant points out that the appellee's score coincidentally also put the appellee in the lowest 12 percent, and fifth among the five foremen evaluated by Stanley.

**3.** The appellant points out that the appellee was employed by Galvan Industries in North Carolina less than one month after he was laid off and remains employed there today.

the adverse decision would not have been made but for the plaintiff's protected class] will cause controversy. Because discrimination is essentially an element of the mind, there will probably be very little direct proof available. Direct proof, however, is not required. What is required of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion. This evidence could, for example, come in the form of an admission by the employer, a case of unequal or disparate treatment between members of the protected class and others by the elimination of the apparent legitimate reasons for the decision, *or statistics in a large operation which show that members of the protected class received substantially worse treatment than others.*

178 W.Va. at 170–71, 358 S.E.2d at 429–30 (emphasis supplied; footnotes omitted).

Accordingly, the appellee in this case showed statistics to support his position. It is the statistical analysis that the appellant maintains is flawed and led to prejudicial error.

Specifically, the statistical evidence introduced in this case consisted of, among other things, the testimony of three experts.

Dr. Robert Reger testified to the use of "descriptive statistics," pointing out that 76% of the retained foremen were younger than the appellee. Reger also testified that 25% of those laid off were under 40 while 36% of those retained were under 40. Appellant contends that this type of statistical evaluation was rejected by the United States Court of Appeals for the Fourth Circuit in *Moultrie v. Martin,* 690 F.2d 1078 (4th Cir.1982), which held that a standard deviation must be used in ensuring

racial balance of grand juries because a conclusion cannot be drawn from a straight statistical comparison.[4] The appellant also contends that Reger's testimony ignored the mine-by-mine basis of the evaluations performed.

Dr. Dietrich Schaupp testified as an expert in performance evaluation systems. Dr. Schaupp testified that the appellant failed to follow its own guidelines in putting its performance evaluation system in practice. Dr. Schaupp testified that age *could have* been a factor in the decision to terminate the appellee's employment, although he only knew the ages of those employees who were laid off, and not of those who were retained.

Kenneth Stollings also testified. Stollings operates a mine consulting business in Boone County, and he testified to comparisons of the average age of foremen on January 15, 1988 and May 31, 1988. Stollings testified that the primary reason for the appellee's employment termination was age.

Dr. Dennis Brady testified for the appellant. Brady testified that based on a number of statistical analyses he performed, the conclusion is that the appellant's policy was age-neutral. Brady also testified that Reger's methodology, *i.e.,* descriptive statistics, does not allow the conclusions drawn, and that his (Brady's) average age analysis concludes that older employees were laid off with younger ones, thus, there was no discrimination based upon age.

This Court has recognized the following point: "Disparate impact in an employment discrimination case is ordinarily proved by statistics[.]" Syl. pt. 3, in part, *Guyan Valley Hospital, Inc. v. West Virginia Human Rights Commission,* 181 W.Va. 251, 382 S.E.2d 88 (1989).[5] *See also Wing v. Iowa Lutheran Hospital,* 426

4. "The 'standard deviation' is a number that ... describ[es] the probability that chance is responsible for any difference between an expected outcome and the observed outcome in a sample consisting of two groups[.]" *Harris v. Marsh,* 679 F.Supp. 1204, 1296 n. 145 (E.D.N.C. 1987). "The greater the number of standard deviations, the less likely it is that chance is the cause of any difference between the expected and observed results." *Id.*

5. *Guyan Valley Hospital* involved allegations of racial discrimination in employment.

N.W.2d 175, 180 (Iowa Ct.App.1988) (under disparate impact theory of discrimination in employment, "plaintiff is initially required to prove, most commonly through statistics, that an employer's facially neutral rule or policy has a disparate impact upon the employment opportunities of a protected class of persons"); *Gay Law Students Ass'n v. Pacific Telephone & Telegraph Co.*, 65 Cal.App.3d 608, 135 Cal.Rptr. 465, 470 (1977), *vacated on jurisdictional grounds*, 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979) (plaintiffs failed to show discrimination based upon sexual preference where *no* statistics were offered to prove such).

The appellant asserts that the testimony of the appellee's witnesses in this regard was prejudicial because they should not have been qualified as experts. Rule 702 of the *West Virginia Rules of Evidence* provides:

> **Rule 702. Testimony by Experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In a case involving the federal Age Discrimination in Employment Act (ADEA),[6] the United States Court of Appeals for the Sixth Circuit upheld the admission of expert testimony of a professor who reviewed the personnel records of the plaintiff, and then testified to the ultimate issue that in his opinion, the plaintiff was a victim of age discrimination. In *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916 (6th Cir.1984), the court held that the broad scope of Rule 702 of the *Federal Rules of Evidence* permitted admission of such expert testimony.[7] The *Davis* court stated:

> The decision to allow a witness to testify as an expert is largely within the discretion of the trial court and will not be disturbed on appeal unless clearly erroneous or an abuse of discretion. *Mannino v. International Manufacturing Co.*,

650 F.2d 846, 849 (6th Cir.1981); *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 634 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978); *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977).

> Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. *Mannino, supra.* The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity *affects the witness' credibility, not his qualifications to testify. Ellis v. K–Lan Co., Inc.*, 695 F.2d 157, 161 (5th Cir.1983).

> . . . .

> We note further that appellant's counsel was given, and took full advantage of, the opportunity to challenge Professor Geraghty's familiarity with the ADEA and his credibility as an expert. . . . In addition, the court carefully instructed the jury that they were to determine the weight and credibility to be given the expert's testimony. . . . Under these circumstances, we conclude that the trial court did not err in permitting the expert testimony of Professor Geraghty.

742 F.2d at 919 (emphasis supplied).

In this case, the appellant was given the opportunity, and exercised such, through the testimony of Dr. Brady to attack the credibility of the testimony of the appellee's witnesses. The jury, however, concluded that age discrimination was a factor in the appellee's employment termination.

■ As indicated by the above, our case law has allowed the use of statistical evidence to prove discrimination in employment. We decline the appellant's invitation to require that a specific *method* of statistical analysis be employed in cases involving certain types of employment termination because we believe that this would unduly

---

**6.** *See* 29 *U.S.C.* § 621, *et seq.*

**7.** Rule 702 of the *Federal Rules of Evidence* is identical to this state's version of that Rule.

burden plaintiffs in exercising their rights under the Human Rights Act.[8]

█ Accordingly, we hold that statistical evidence may be employed by a plaintiff in proving a claim of age discrimination in employment under the West Virginia Human Rights Act, *W.Va.Code*, 5–11–1, *et seq.* Under Rule 702 of the *West Virginia Rules of Evidence* it is not an abuse of discretion for the circuit court to allow the use of such statistical evidence if the defendant has the opportunity to rebut the same.

Therefore, the judgment of the circuit court is affirmed in this regard.[9]

### III

█ The appellant also contends that the giving of certain instructions by the circuit court constituted reversible error. We address the one instruction that we believe merits discussion.[10]

Specifically, the instruction at issue is Instruction No. 13 offered by the appellee, and given by the circuit court. That instruction, in its entirety, provided:

> The Court instructs the Jury that if you have determined that the plaintiff, Dallas Dobson, was unlawfully discharged by Eastern, by Count 1—Termination or by Count 2—Refusal to Hire, or both, then in arriving at the amount of any award for damages, you should include:
>
> (1) the reasonable value of the time, if any, shown by the evidence in the case to have been necessarily lost up to date by the plaintiff since the unlawful discharge. In determining this amount, you should consider any evidence of plaintiff's earning capacity, his earnings, and the manner in which he ordinarily occupied his time before the unlawful discharge, and find what he was reasonably certain to have earned during the time so lost, had he not been unlawfully discharged; and
>
> (2) also such sum as will reasonably compensate the plaintiff for any loss of future earning power, proximately caused by the unlawful discharge, which you find from the evidence in the case that plaintiff is reasonably certain to suffer in the future. In determining this amount, you should consider what plaintiff's health, physical ability and earning power were before the unlawful discharge and what they are now; the nature and extent of his injuries, whether or not they are reasonably certain to be permanent; or if not permanent, the extent of their duration; whether he will ever be able to obtain employment as an underground foreman in the coal industry; all to the end of determining, first, the effect, if any, of his unlawful discharge upon his future earning capacity, and, second, the present value of any loss of future earning power, which you find from the evidence in the case that plaintiff is reasonably certain to suffer in the future, as a proximate result of the unlawful discharge.

As pointed out by the appellant, the damages contained in this instruction concern the appellee's loss of future earning power

---

**8.** In *Kanawha Valley Regional Transportation Authority v. West Virginia Human Rights Commission,* 181 W.Va. 675, 383 S.E.2d 857 (1989), this Court addressed an age discrimination claim in the context of a reduction in force. There, as the appellant points out, the reduction in force consisted of only one employee. In this case, the reduction consisted of laying off 23 of 182 similarly situated employees, or approximately 12.64%. However, we do not believe that this distinction, as intimated by the appellant, has any bearing on the use of statistical evidence in proving a claim of discrimination.

**9.** This Court has also reviewed the briefs of *amici curiae,* specifically, the West Virginia Human Rights Commission, the West Virginia

Chapter of the National Organization for Women, the West Virginia Civil Liberties Union, and the West Virginia Branch of the National Association for the Advancement of Colored People, all urging affirmance of the circuit court's admission of the statistical evidence in this case.

**10.** The appellant also asserts that the verdict forms used in this case were improper because they required the appellant to "show" and "establish" a legitimate business reason for laying off and not hiring the appellee, whereas its burden is merely to "articulate" such a reason. However, we believe that the verdict forms used in this case do not merit reversal inasmuch as the language contained therein is consistent with our holding in *Conaway.*

or front pay. *See Casteel v. Consolidation Coal Co.*, 181 W.Va. 501, 507 n. 8, 383 S.E.2d 305, 311 n. 8 (1989). The appellant claims that such damages have no statutory authorization.[11]

*W.Va.Code*, 5–11–13(c) [1983] provides:

(c) In any action filed under this section, if the court finds that the respondent has engaged in or is engaging in an unlawful discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay or any other legal or equitable relief as the court deems appropriate. In actions brought under this section, the court in its discretion may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant.

The appellee acknowledges that *W.Va. Code*, 5–11–13(c) [1983] does not expressly provide the specific damages that are contained in Instruction No. 13, but maintains that under this Court's holdings in other cases, we have implied that such damages are authorized. For example, in *Perilli v. Board of Education*, 182 W.Va. 261, 263, 387 S.E.2d 315, 317 (1989), we held:

[M]oney damages for sex discrimination sounds in tort. That is, sex discrimination is an injury to the health, welfare, and dignity of the victim. Because her claim is a species of personal injury akin to tort, the plaintiff in a sex discrimination case has the right to try to a jury her factual claims that would entitle her to money damages for personal injury.

The appellee argues that this language as well as the phrase "or any other legal or equitable relief as the court deems appro-

priate," which is contained in *W.Va.Code*, 5–11–13(c) [1983], is the authorization for allowing damages such as loss of future earning power.

We agree with the appellee's argument on this point. Because cases involving discrimination may be brought in the circuit courts of this state, as opposed to exclusively before the Human Rights Commission, *see* syl. pt. 1, *Price v. Boone County Ambulance Authority*, 175 W.Va. 676, 337 S.E.2d 913 (1985), then the damages would be those recoverable in any action sounding in tort.

This is consistent with an interpretation of the ADEA by a federal court.[12] In *Maxfield v. Sinclair International*, 766 F.2d 788 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986), the United States Court of Appeals for the Third Circuit pointed out:

The inclusion of equitable relief strengthens the conclusion that Congress intended victims of age discrimination to be made whole by restoring them to the position they would have been in had the discrimination never occurred.

Front pay, an award for future earnings, is sometimes needed to achieve that purpose. Ordinarily, an employee would be made whole by a backpay award coupled with an order for reinstatement. Reinstatement is the preferred remedy to avoid future lost earnings, but reinstatement may not be feasible in all cases.

766 F.2d at 796.

Accordingly, we hold that where a plaintiff, as an alternative to filing a complaint with the Human Rights Commission, has initiated an action in circuit court to enforce the West Virginia Human Rights Act, *W.Va.Code*, 5–11–1, *et seq.*, then he or she may recover damages sounding in tort.[13]

---

**11.** The appellant also maintains that the type of damages recovered by the appellee were under the "rubric" of emotional distress damages.

**12.** 29 *U.S.C.* § 626(c), which is similar to *W.Va. Code*, 5–11–13(c) [1983], provides that a person bringing an action under the ADEA may seek "legal or equitable relief as will effectuate the purposes of" the ADEA.

**13.** The appellant argues that because the instruction included references to the appellee's health and physical ability, then the instruction, in effect, allowed a double recovery. We do not agree with the appellant's interpretation. As can be plainly seen from the language of the instruction, the references to the appellee's health and physical ability were not in relation to *recovering* for such, but rather, were in rela-

Because the damages recovered by the appellee in this case are recoverable under general theories of tort law, the circuit court's instruction does not constitute reversible error. Our holding in this regard is consistent with our previous holdings that an action to enforce the provisions of the Human Rights Act may be brought in the circuit court and recovery may be obtained under general theories of tort law. *See Price* and *Perilli.* [14]

## IV

The appellant also contends that the appellee should not have been permitted to introduce evidence (and presumably recover) back pay or front pay accruing after the date of the appellant's "unconditional" offer of a face supervisor position in October, 1989. The appellee, on the other hand, contends that because this offer was "conditioned" upon the passing of a physical examination, then it was not an "unconditional" offer of reinstatement.

In *Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), the United States Supreme Court held that an employer who is charged with discrimination in hiring may toll the continuing of back pay damages by unconditionally offering the plaintiff the job that was previously denied.

The appellant maintains that the requirement of the appellee passing a physical examination does not vitiate the unconditional nature of the offer. However, in *Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d 743, 757 (7th Cir.), *cert. denied,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983), the court held that under the ADEA, it was not unreasonable for the plaintiff to believe that the defendant's re-

instatement offer was not unconditional because it "was expressly conditioned upon [the plaintiff's] taking and passing a physical exam arranged by the [defendant]." [15]

Obviously, as the *Maxfield* court stated, reinstatement would be the preferred remedy. However, in a case brought under the West Virginia Human Rights Act, *W. Va. Code*, 5–11–1, *et seq.*, an offer of reinstatement that is subject to the passing of a physical examination is not an "unconditional" offer of reinstatement.

We do not believe that the appellee was offered an "unconditional" offer of reinstatement, and therefore, the circuit court did not commit error by allowing evidence of back pay and front pay subsequent to the appellant's offer of reinstatement.

## V

For reasons stated in this opinion, the judgment of the Circuit Court of Boone County is affirmed.[16]

Affirmed.

NEELY, J., deeming himself disqualified, did not participate in the consideration or decision of this case.

BROTHERTON, J., dissents and reserves the right to file a dissenting opinion.

---

tion to the *effect* on the appellee's future ability to earn, given his state of health, whatever it may have been.

**14.** Inasmuch as "mitigation of damages" is an aspect of recovery in *tort,* we note that no such issue is raised with respect thereto.

**15.** Furthermore, in *Ford Motor Co.,* the United States Supreme Court noted that a trial court may consider the effect of a long distance move

in evaluating the plaintiff's rejection of an offer of reinstatement. 458 U.S. at 238–39 n. 27, 102 S.Ct. at 3069 n. 27, 73 L.Ed.2d at 737 n. 27. In this case, as noted previously, the appellee had moved to North Carolina.

**16.** Other assignments of error raised by the appellant, such as the general conduct of the trial, and attorney's fees awarded are, based upon our review of the record, without merit.